JANVIER, Judge.
The plaintiff, C. O. Lyle, Jr., having purchased from the defendant, W. H. Hodges & Co., Inc., a young bull for. the sum- of $106.40 and the. animal having died on the third day aftey the purchase, brought this suit for the recovery of the purchase price and for $20 which he alleges he paid *458 for the services of veterinarians employed by him' in an effort to save the-life of the bull. He alleges that, although the animal appeared to be in a sound healthy condition at the time of the purchase, the truth is that it was afflicted with a disease which later caused its death.
Defendant corporation admitted the sale' of the bull but denied that, at the time of the sale, it was afflicted with any disease, and averred that the death was caused by a disease which resulted from negligent handling by plaintiff’s employees.
In the Civil District Court for the Parish of Orleans there was judgment for defendant and plaintiff has appealed.
The record shows that on Saturday, May 19, 1951, the plaintiff sent his son-in-law, Charles A. Johnson, to a stockyard just below or just within the lower limits' of the City of New Orleans for the purpose of purchasing two young bulls, one for himself and one for Johnson and a friend of Johnson. 'Johnson and an employee of Lyle, Spencer L. Niolon, went to the stockyard in a “stake-body” truck and discussed with Mr. Roy Hodges the purchase of the two animals. They then selected the two animals, one of which was for- the plaintiff, Lyle. The animals selected were a young Brahma bull calf for Johnson and his friend, and a white-faced Hereford bull, which was for the plaintiff, Lyle. So far as could be ascertained by visual inspection both animals were in good condition, though the white-faced Hereford bull was quite fractious. It was very difficult to catch the young Hereford bull, and employees of the defendant corporation found it necessary to trap it by partially opening a gate and then closing the gate on the neck of the animal as it attempted to pass through. The truck was then backed up to the loading platform and the two animals were' walked up a ramp to the platform and then into the truck.
The Hereford bull was tied to the side of the truck by two ropes which were tied by employees of plaintiff. One of these ropes was a large one which was tied in a fixed knot arount its neck, and the other was a smaller rope which was also tied around the neck of the animal and which was then wrapped around what is referred to in the record as the “snoot” of the young animal.
It was explained by Johnson that this second rope was used because the sides of the stake body of the truck were not high— only three or four feet — and he was afraid that the fractious young animal might attempt to jump over the side and strangle himself and escape.
The distance from the stockyard to the pasture of plaintiff was about 15 miles and the trip required about an hour and a half. During the trip the Hereford bull fell to its haunches twice and the truck was stopped and the bull forced to rise to its feet.
There is nothing to show that either of the ropes actually strangled or impeded the breathing of the animal, except that the record shows that when the young bull fell to its haunches the second time, the rope which went around its snoot was partially loosened. When the animal arrived at the pasture it was soon noticed that it seemed to be depressed and would not eat. A veterinarian was summoned and he ■ concluded that the animal was afflicted with hemorrhagic septicemia which “seemed to be complicated with acidosis.” He said that in plain language “hemorrhagic septicemia” means “shipping fever, shipping pneumonia.” He said that he would consider it reasonable that the animal had the disease “at the time it was purchased.” On the next day plaintiff was able to obtain the services of Dr. Thomas W. Melius, Jr., another veterinarian, and Dr. Melius diagnosed the condition hemorrhagic septicemia and gave that as the cause of death which occurred on the following day. He so stated in a letter which he wrote to plaintiff. Later he wrote another letter to the defendant corporation, and in that second letter he stated:
“ * * * there is a possibility that the animal could have died as a result of the handling in improper use of the ropes when the animal was' first taken away from the stockyards. * * * ”
*459 In his oral testimony, Dr. Melius referred to the method of tying the animal in the' truck and said that that method was improper and might have caused the disease. He was asked the following question:
“Q. Would you say that any of the following factors would cause the contracting of this particular disease: First, a highly nervous animal; secondly, much excitement and running over a period of half hour say; thirdly, handling of the particular cattle by ,a person by jamming his head into a gate, tying ropes around his neck, falling down of these cattle on cobblestones, and the transportation for one hour in an open truck? Would any of those factors cause the disease of hemorrhagic septicemia ?,
And he answered:
“A. Not the disease itself, 'but they might produce the condition which would greatly resemble hemorrhagic septicemia.”
The doctor further said that it was possible that the bull had this disease at the time of the sale and that evidences thereof might not have manifested itself until later. He said that the disease could not have been caused by acidosis, caused by strangulation in the course of transportation.
Counsel for defendant tried diligently to obtain from Dr. Melius a statement to the effect that, since the animal had been inspected by the Federal inspector while it was in the stockyard and since the condition had not been discovered by the Federal inspector, it must necessarily follow that the disease had been caused by mishandling in transportation. The doctor was asked the following question:
“Now if I went further and told you that this animal was passed by the Federal inspection down there before it was placed in the truck and was found to be in good condition, would you say that this condition was brought on by mishandling in the course of transportation ?
And he ¿nswered:
“Very likely. It could have been also possible that the animal was not exhibiting enough symptoms to be sick at the time he passed through there.”
We conclude that from all of the testimony neither veterinarian was able to state, with any certainty at all, that the animal, had died from a disease which was contracted after the sale. In this situation it is interesting to consider the effect.of Article 2530 of our LSA-Civil Code which reads as follows:
“The buyer who institutes the red-hibitory action, must prove that the vice existed before the sale was made to him. If the vice has made its appearance within three days immediately following the sale, it is presumed to have existed before the sale.”
Counsel for defendant says that the death did not occur until a few hours after the expiration of the third day after the sale, and that consequently the presumption which comes into existence as a result of the codal article has no application here. Even if the death did not occur until a few hours after the expiration of the third day, it is abundantly made evident by the testimony that the disease itself did make its appearance almost immediately after the animal arrived at the pasture of the plaintiff. Banks v. Botts, 10 La. 42.
We have no doubt that such a disease is a'vice within the contemplation of the codal article. There is an abundance of jurisprudence to the effect that disease in an animal constitutes a vice which is within the contemplation of Article 2530 of the LSA-Civil Code. Howell v. Rouseo, 10 Orleans App. 268; Duffy v. McHenry Horse Exchange, 12 Orleans App. 22; Michoud v. Marquet, 4 La.Ann. 51; Banks v. Botts, supra.
Since this vice manifested itself within three days after the sale, there was-created, as a result of the codal article a presumption that the vice existed prior to' *460 the sale and this presumption placed upon the defendant the burden of showing either that the vice did not actually exist or that the death did' riot "result from that vice.
Defendant’s-.evidence to no extent at all overcomes the presumption which results from the codal -article. 'A-ll that either of the veterinarians 'would say was that the death “ihight” have resulted from mishandling. Dr. Douglas stated that the disease might have been contracted as a result of contact with other animals, but the evidence shows conclusively that the only other-animal with which this one came into con^ tact- after the..sale was the other young bull which was bought from this same -defendant. ....
. Our conclusion is that, as a result of the effect of Article 2.530 of the Code, there-was created a presumption that the animal was diseased and that defendant has not overcome the effect of this presumption.
Consequently, the plaintiff is entitled to recover the purchase price and, because of the effect of Article 2531 of the LSA-Civil Code, such expenses as were made necessary by an attempt at “preservation” of the animal.
Plaintiff alleges - that he paid $20 • to veterinarians' and in the evidence we find-proof of bills amounting to $25.50. However, since he prayed for $20 only this amount will be allowed.
The District Judge allowed and taxed as costs a fee of $25 for each'of. the two experts. We find no fault with this award.
The judgment appealed 'from, in so far’ as it dismissed the demand of plaintiff, is annulled, avoided and reversed' and there is now judgment in favor of plaintiff, C. O. Lyle, Jr., and against defendant, W. H. Hodges & Co., Inc., in the sum of $126.40, with legal interest from judicial demand. In so far as the judgment fixed and taxed as costs a fee of $25. for each of the two experts, the judgment is affirmed; defendant. to pay all costs. • •
Reversed in párt'.' Affirmed in -part. -